**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 2 5 2019 ★

BROOKLYN OFFICE

SSS:GK
F. #2019R00131

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MICHAEL NADEL and
YARIN NADEL,
    also known as "Joe Nadel,"

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

CR 19 493

(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1001(a)(3), 1349, 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

**VITALIANO , J.**

**SCANLON, M.J.**

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendants and Relevant Entities

    1.    The defendant MICHAEL NADEL was a resident of Queens, New York, and was an owner, officer and operator of several affiliated companies engaged in the interstate transportation of household goods and property by motor carrier, including but not limited to Around the Clock Moving Services, Inc.; Direct Van Lines Services, Inc.; State to State Moving NY Inc.; Green Peace Transportation LLC; Moving State to State LLC and State to State Moving Group LLC (collectively, the "State to State Companies").

    2.    The defendant YARIN NADEL, also known as "Joe Nadel," was a resident of Queens, New York, and was an owner, officer and operator of the State to State Companies.

3.     Around the Clock Moving Services, Inc. was a New York corporation that maintained a principal place of business in Queens, New York.

4.     Direct Van Lines Services, Inc. was a New York corporation that maintained a principal place of business in Queens, New York.

5.     State to State Moving NY Inc. was a New York corporation that maintained a principal place of business in Queens, New York.

6.     Green Peace Transportation LLC was a Pennsylvania limited liability company that maintained a reported principal place of business in Levittown, Pennsylvania.

7.     Moving State to State LLC was a New York limited liability company that maintained a principal place of business in Queens, New York.

8.     State to State Moving Group LLC was a New York limited liability company that maintained a principal place of business in Queens, New York.

II.     The Interstate Moving Services Fraudulent Scheme

A.     Federal Regulations Governing Moving Companies

9.     During all relevant times, companies engaged in the transportation of household goods in interstate commerce were subject to federal regulations set forth in Title 49, Code of Federal Regulations, Section 375.

10.     A company engaged in the transportation of household goods was required to provide customers with a written estimate of the charges for transportation and all related services based on a telephonic or physical inventory of the goods to be shipped, and to indicate whether the estimate was binding or non-binding.

11.     A binding estimate was an agreement made prior to transportation that guaranteed the total cost of the shipment based on the quantities and services listed in the

estimate.   For binding estimates, a company was required to deliver the household goods, as contracted, upon full payment of the original estimate amount.   Any costs associated with the shipment of additional household goods or services that were not identified in the binding estimate were permitted to be billed after the goods were delivered.   49 C.F.R. § 375.403.

12.   For non-binding estimates, the final charges were based on the actual weight or volume of the shipment, the services provided and the tariff provisions in effect. The final charges for a shipment involving a non-binding estimate were not permitted to be increased above the initial estimate by more than 10 percent.   49 C.F.R. § 375.703(b).

B.   The Fraudulent Scheme

13.   In or about and between February 2018 and July 2019, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, agreed to defraud customers and potential customers of the State to State Companies, directly and through brokers, by misrepresenting the estimated charges for their moving services and then requiring customers to pay additional fees, often more than 10 percent of the original estimate, by refusing to return, and threatening to sell and auction, the customers' belongings if the fees were not paid.

14.   As a part of the scheme, the defendants, together with others, registered corporate entities, including but not limited to the State to State Companies, often using fictitious names and business addresses, which the defendants, together with others, owned, operated and controlled, and used for their interstate moving business.

15.   As a further part of the scheme, the defendants, together with others, induced customers to contract with the State to State Companies by making false representations that the State to State Companies offered competitive rates for premium

interstate moving services.   Among other things, the defendants, together with others,

(i) quoted estimated charges for their moving services that they had no intention of honoring;

(ii) misrepresented the number, ownership and United States Department of Transportation

("USDOT") registration of the trucks to be used to transport customers' goods;

(iii) misrepresented the number of movers who would transport the customers' goods; and

(iv) misrepresented various quality control measures that would be used in transporting the

customers' goods.

16.    As a further part of the scheme, on or after the agreed-upon pick-up

dates, employees of the State to State Companies arrived at customers' residences, often in

rental trucks that were too small or too few to accommodate the volume of goods to be

shipped.

17.    As a further part of the scheme, at various points in the loading

process—and often after customers' household goods were completely loaded into the

trucks—the defendants, together with others, told the customers in person, by email and by

telephone, that due to some unforeseen circumstance, additional fees were due.   The

additional fees often exceeded the 10 percent price increase restriction for non-binding

estimates set forth in Title 49, Code of Federal Regulations, Section 375.703(b).   The

defendants, together with others, demanded payment of these fees, often in cash, before the

State to State Companies would deliver the household goods to the customers.

18.    As a further part of the scheme, if customers of the State to State

Companies refused to pay the additional fees, in some instances, the defendants, together

with others, threatened to keep the customers' belongings in storage, and to charge and remit

additional storage fees to the customers.

19.     Many customers of the State to State Companies ultimately paid the inflated additional fees to ensure delivery of their possessions.   In many instances, the customers' belongings were delivered weeks or months after the scheduled delivery dates and valuable items were damaged or missing.

20.     As a result of the fraudulent scheme, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, wrongfully obtained at least $100,000 in additional fees from dozens of customers of the State to State Companies, and caused damage to the customers' personal belongings.

III.     The Reincarnated or Affiliated Motor Carrier Scheme

A.     Federal Motor Carrier Safety Laws and Regulations

21.     The Federal Motor Carrier Safety Administration ("FMCSA") was an agency of USDOT.   Its primary mission was to reduce fatalities and injuries involving commercial motor vehicles.   FMCSA adopted regulations governing commercial motor carriers ("motor carriers"), including regulations requiring them to be properly licensed, insured, maintained and operated.

22.     During all relevant times, motor carriers operating in interstate commerce were required to register with FMCSA and obtain a USDOT number.   49 U.S.C. §§ 13901-13904.   A USDOT number was a unique identifier that aided FMCSA in collecting and monitoring a motor carrier's safety record and other information, including but not limited to audits, compliance reviews, crash investigations and inspections. Depending on the nature of the business of the motor carrier, many motor carriers operating in interstate commerce, including motor carriers engaged in the shipment of household

goods, were also required to obtain interstate operating authority from USDOT.   49 C.F.R § 365.105.

23.     To obtain a USDOT number and operating authority, motor carriers were required to complete and submit to FMCSA, under penalty of perjury, a Form MCSA-1.   Form MCSA-1 required an applicant to provide, among other things, the following information: (i) the motor carrier's business address; (ii) the motor carrier's insurance information; (iii) information regarding the motor carrier's compliance with USDOT safety regulations; and (iv) the motor carrier's relationship and affiliation with any other motor carrier within the preceding three years.   A motor carrier was also required to submit Form MCS-150 (Motor Carrier Identification Report) to provide biennial updates and to report any material changes, such as a change in ownership.

24.     If a motor carrier planned to cease all or some of its operations, the motor carrier was permitted to voluntarily request the revocation of all or part of its operating authority by completing and submitting to FMCSA, under penalty of perjury, a Form OCE-46 (Request for Revocation of Authority Granted).

25.     To prevent motor carriers from concealing poor safety or compliance records, motor carriers were required to identify reincarnated or affiliated motor carriers, collectively defined as motor carriers with common ownership, management, control or familial relationship.   49 C.F.R. § 385.1003.   In particular, Title 49, Code of Federal Regulations, Section 385.1005 prohibited two or more motor carriers from using common ownership, management, control or familial relationship to avoid compliance with legal requirements or otherwise conceal non-compliance or a history of non-compliance.

26.     FMCSA's New Entrant Safety Assurance Program applied to motor carriers applying for a USDOT number (a "New Entrant").   Pursuant to this program, a New Entrant was monitored during an initial 18-month period, and FMCSA or State employees were expected to conduct a Safety Audit within 12 months after the New Entrant began operations.   If a New Entrant did not submit to this initial safety audit, its New Entrant registration was revoked, and the New Entrant's operations were removed from service.

27.     In addition to New Entrant Safety Audits, FMCSA routinely performed compliance reviews of motor carriers.   A compliance review consisted of an on-site examination of the motor carrier's operations, such as drivers' hours of service, maintenance and inspection of vehicles, driver qualifications, commercial driver's license requirements, financial responsibility, accidents, hazardous materials and other safety and transportation records.   The purpose of the compliance review was to determine whether a motor carrier met the safety fitness standard established in Title 49, Code of Federal Regulations, Section 385.5.   FMCSA also conducted compliance reviews in response to requests to change a safety rating, to investigate potential violations of safety regulations by motor carriers and to investigate complaints or other evidence of safety violations.

28.     A motor carrier was issued a safety rating after FMCSA completed a compliance review.   There were four types of safety ratings: Satisfactory, Conditional, Unsatisfactory and Unrated.   A motor carrier's safety rating, among other things, affected its insurance rates and ability to compete for business.

29.     FMCSA maintained an online records repository called the Safety and Fitness Electronic Records ("SAFER") System that was accessible on a website.   FMCSA uploaded information provided by a motor carrier, including the business name, business

address, business telephone number and insurance information, onto the SAFER System. Information regarding the number of drivers, crashes, insurance and bonds, inspections and enforcement activity was also available on the SAFER System.   The public could access the SAFER System to assess a particular motor carrier.

      B.     The Fraudulent Scheme

      30.     In or about and between November 2015 and July 2019, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, agreed to defraud the United States and USDOT by knowingly and intentionally completing and submitting, under penalty of perjury, forms to USDOT regarding motor carriers that the defendants owned, operated and controlled, which forms they knew contained false information and failed to disclose the motor carriers' affiliations with other motor carriers whose operating authority had been revoked or suspended by FMCSA.

      31.     On or about November 20, 2015, the defendant MICHAEL NADEL applied to obtain a USDOT number for Around the Clock Moving Services, Inc.

      32.     FMCSA contacted Around the Clock Moving Services, Inc., conducted a site visit and scheduled an appointment to conduct a focused commercial investigation. On or about September 16, 2016, prior to the scheduled appointment, the defendant MICHAEL NADEL completed, under penalty of perjury, a Form OCE-46, which he later submitted to FMCSA, in which he identified the reason for filing as "Out of Business." Around the Clock Moving Services, Inc.'s operating authority subsequently was revoked on or about October 31, 2016.

      33.     Following the revocation of Around the Clock Moving Services, Inc.'s operating authority, the defendants, together with others, continued operating the State to

State Companies through various reincarnated or affiliated motor carriers, which they used to evade safety regulations and accountability.   The defendants, together with others, took steps to hide affiliations among the various motor carriers that they owned, operated and controlled, including by obtaining registration numbers under the names of multiple corporate entities and by submitting forms to FMCSA on behalf of the State to State Companies that they knew contained false statements.   The defendants also failed to disclose the State to State Companies' affiliations with other motor carriers whose operating authority had been revoked or suspended by FMCSA.

34.     During all relevant times, the defendants, together with others, continued to transport household goods in interstate commerce in exchange for money.

## COUNT ONE
### (Conspiracy to Defraud the United States)

35.     The allegations contained in paragraphs one through 34 are realleged and incorporated as if fully set forth in this paragraph.

36.     In or about and between November 2015 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, did knowingly and willfully conspire to impede, impair, obstruct and defeat the lawful government functions of USDOT and FMCSA, departments and agencies of the United States, in the enforcement of safety regulations governing the use of commercial motor vehicles in interstate commerce.

37.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants did commit and cause the commission of, among others, the following:

OVERT ACTS

(a)     On or about September 21, 2016, MICHAEL NADEL submitted to FMCSA, under penalty of perjury, a Form MCS-150 for Around the Clock Moving Services, Inc., in which he identified himself as the president of Around the Clock Moving Services, Inc. and provided a fraudulent principal address and mailing address.

(b)     On or about September 14, 2017, MICHAEL NADEL submitted to FMCSA, under penalty of perjury, a Form MCSA-1 for Direct Van Lines Services, Inc., in which he identified himself as the owner of Direct Van Lines Services, Inc. and failed to disclose Direct Van Lines Services, Inc.'s affiliation and relationship with Around the Clock Moving, Inc., whose operating authority had been inactivated.

(c)     On or about February 12, 2018, YARIN NADEL submitted to FMCSA, under penalty of perjury, a Form MCSA-1 for State to State Moving NY Inc., in which he identified himself as the president of State to State Moving NY Inc., provided a fraudulent principal address and mailing address and failed to disclose State to State Moving NY Inc.'s affiliation and relationship with Direct Van Lines Services, Inc. and Around the Clock Moving, Inc.

(d)     On or about April 2, 2018, YARIN NADEL submitted to FMCSA, under penalty of perjury, a Form MCSA-1 for Yarin Nadel, in which he identified himself as the company's Chief Executive Officer.   In the Form MCSA-1, YARIN NADEL disclosed the company's affiliation with State to State Moving NY, Inc., but failed to

disclose the company's affiliation and relationship with other State to State companies, including but not limited to Around the Clock Moving, Inc. and Direct Van Lines Services, Inc.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNTS TWO THROUGH FIVE
(False Statements)

38.    The allegations contained in paragraphs one through 34 are realleged and incorporated as if fully set forth in this paragraph.

39.    On or about the dates listed below, within the Eastern District of New York and elsewhere, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the USDOT and FMCSA, did knowingly and willfully make and use false writings and documents knowing the same to contain materially false, fictitious and fraudulent statements and entries, as set forth below.

| Count | Approximate Date | Document | False Statements/Entries | Defendant |
|---|---|---|---|---|
| Two | 9/21/2016 | Form MCS-150 for Around the Clock Moving Services, Inc. | Principal address; mailing address | MICHAEL NADEL |
| Three | 9/14/2017 | Form MCSA-1 for Direct Van Lines, Inc. | Lack of affiliation with other FMCSA-licensed entities | MICHAEL NADEL |
| Four | 2/12/2018 | Form MCSA-1 for State to State Moving NY, Inc. | Lack of affiliation with other FMCSA-licensed entities | YARIN NADEL |
| Five | 4/2/2018 | Form MCSA-1 for Yarin Nadel | Lack of affiliation with other FMCSA-licensed entities | YARIN NADEL |

(Title 18, United States Code, Sections 1001(a)(3), 2 and 3551 et seq.)

## COUNT SIX
(Conspiracy to Commit Wire Fraud)

40.     The allegations contained in paragraphs one through 34 are realleged and incorporated as if fully set forth in this paragraph.

41.     In or about and between February 2018 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud customers and potential customers of the State to State Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate commerce, one or more writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE AND SIX

42.     The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Counts One and Six, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

43.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable

property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2019R00131

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

MICHAEL NADEL *and* YARIN NADEL, *also known as* "*Joe Nadel,*"

Defendants.

## INDICTMENT

(T. 18, U.S.C., §§ 981(a)(1)(C), 1001(a)(3), 1349, 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                          *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                                   *Clerk*

*Bail, $* _____

_____

*Gillian A. Kassner, Assistant U.S. Attorney (718) 254-6224*